**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.:

HAMMOCKS COMMUNITY
ASSOCIATION INC.,

        Plaintiff,

v.

STATE OF FLORIDA, OFFICE OF
THE STATE ATTORNEY, ELEVENTH
JUDICIAL CIRCUIT,

        Defendant.

_____/

**COMPLAINT FOR DECLARATORY JUDGMENT,**
**<u>INJUNCTIVE RELIEF AND DAMAGES</u>**

Plaintiff, HAMMOCKS COMMUNITY ASSOCIATION, INC.,[1] brings this Complaint against the STATE OF FLORIDA, OFFICE OF THE STATE ATTORNEY, ELEVENTH JUDICIAL CIRCUIT,[2] and seeks injunctive, declaratory, and equitable relief.  In support thereof, the Hammocks states the following:

**THE PARTIES, JURISDICTION, AND VENUE**

At all times material to this action:

1.     The Hammocks is a non-profit organization organized under the laws of the State of Florida and has its principle place of business in Miami-Dade County, Florida.

2.     The State Attorney's Office is a public entity incorporated under the laws of the State of Florida.

---

[1] Hereafter referred to as the "Hammocks" or "Plaintiff."
[2] Hereafter referred to as the "State Attorney's Office" or "Defendant."

3.      This Court has jurisdiction over this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

4.      Last month, the Supreme Court reiterated that "[s]ection 1983 broadly authorizes suit against state officials for the "deprivation of any rights" secured by the Constitution.  *Nance v. Ward*, No. 21-439, 2022 WL 2251307, at *5 (U.S. June 23, 2022).  The Court continued:

> One of the "main aims" of §1983 is to "override"—and thus compel change of—state laws when necessary to vindicate federal constitutional rights. *Monroe* v. *Pape*, 365 U. S. 167, 173 (1961); see *Zinermon* v. *Burch*, 494 U. S. 113, 124 (1990). Or said otherwise, the ordinary and expected outcome of many a meritorious §1983 suit is to declare unenforceable (whether on its face or as applied) a state statute as currently written. See, *e.g.*, *Cedar Point Nursery* v. *Hassid*, 594 U. S. ___ (2021). And in turn, the unsurprising effect of such a judgment may be to send state legislators back to the drawing board. See, *e.g.*, *Kolender* v. *Lawson*, 461 U. S. 352, 358 (1983).

Id. at 7.

5.      Venue is proper because the events giving rise to this claim all occurred within Miami-Dade County, Florida.

## LEGAL BASIS

6.      Before explaining the facts in this case, it would be helpful to briefly describe the legal basis for bring this lawsuit.

7.      The State Attorney's Office issued three separate and unduly burdensome *subpoenas duces tecum* to the Hammocks under Florida Statute 27.04, which essentially required the Hammocks to examine *all* of its records and produce the vast majority of them.

8.      Were the Hammocks to comply, it would be required to produce over a million documents.

9.      One detective working with the State Attorney's Office explained, "I requested a subpoena for *all documents* from the Hammocks, all minutes, all vendors, [and] all contracts."

10. When describing the enormous scope of its request, the State Attorney's Office told a state court judge, "We apologize, and it's very unfortunate that the scope of this investigation is very broad… I'm not saying it's not difficult to go through these records. … I mean, we make no bones about that…

11. The State Attorney's Office further claimed that, "Nowhere in the case law that says, if something is really hard, that they don't have to do it."

12. The Hammocks vehemently disagrees with the State Attorney's Office's contention.

13. For over 140 years, the Supreme Court has repeatedly held that a *subpoena duces tecum* may constitute a search forbidden by the Fourth Amendment. See *Boyd v. United States*, 116 U.S 616, 621-622 (1886).

14. According to the Supreme Court, a *subpoena duces tecum* might constitute a forbidden search if its terms were "unreasonable" and "far too sweeping in its terms." *Hale v. Henkel*, 201 U.S. 43, 76 (1906).

15. According to *Hale*, "some necessity should be shown, either from an examination of the witness orally, or from the known transactions of these companies with the other companies implicated, or some evidence of their materiality produced, to justify an order for the production of such a mass of papers." *Id*. at 77.

16. In the landmark case of *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186 (1946), the Supreme Court reaffirmed that there are still constitutional restrictions on the scope of *subpoenas duces tecum*.

17. In *Oklahoma Press*, the Supreme Court ruled that *subpoenas duces tecum* must be supported by probable cause and relevant, and not unreasonable, excessive or overbroad.

18. In *See v. City of Seattle*, 387 U.S. 541, 544 (1967), the Supreme Court held that "the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."

19. In *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984), the Supreme Court affirmed its position in *See* and quoted the exact same language.

20. As recent as 2017, the Supreme Court reaffirmed that *subpoenas duces tecum* must be relevant to the matter under investigation and cannot be unduly burdensome. *McLane Co. v. E.E.O.C.*, 137 S. Ct. 1159, 1162 (2017).

21. According to *McLane*, to determine if a subpoena is overly burdensome, courts must consider the nature of the materials sough and the difficulty the entity will face in producing them. *Id.*

22. The State's contention that it can issue subpoenas with impunity is simply incorrect, and has been so for over 140 years.

23. Here, as described in detailed below, the State Attorney Office's three subpoenas requiring the Hammocks to search through *all* of its documents and produce the *vast majority* of them is unreasonable, burdensome, and overly broad.

## FACT GIVING RISE TO THE CLAIM

24. To understand the difficulty of the State Attorney Office's request, it is important to understand the size and scope of the Hammocks as a homeowners association.

25. The Hammocks is the largest homeowner's association in Florida.

26. It encompasses over 3,800 acres of land, waterways, and beaches in Southwest Miami-Dade County.

 



27.     The Hammocks has 6,537 residential units, including single-family homes, townhomes, and condominiums.

28.     Approximately 20,000 people live in the Hammocks.  If it were a city, its land area would be larger than Miami Shores, Key Biscayne, and El Portal *combined*.



29.    The Hammocks is so large that it has its own Fourth of July fireworks display.



30.    The Hammocks has 44 subordinate associations, and its management team directly manages 18 sub-associations.

31.    The Hammocks is responsible for maintaining over 40,000 trees, 23 beaches, and

literally miles and miles of hedges, sidewalks, bike paths, and nature trails.

 

 

32. The Hammocks has six pools, two activity centers, and provides various activities to its members, including tutoring, movie night, holiday parties, etc.

  



33.     In many ways, the Hammocks operates as a city.

34.     However, the Hammocks' operation is more complicated and document intense then many cities in Miami-Dade County because of the services and amenities that it provides to its residents.

35.     The State Attorney Office's document request is akin to asking a city to examine each document in its possession and to provide the vast majority of them.

**The State Already Has Thousands of Documents.**

36.     Before getting into the State Attorney's Office subpoena requests to the Hammocks, it is also important to mention the large amount of subpoenas that the State Attorney's Office sent to vendors, banks, and other companies that do business with the Hammocks.

37.     In 2017, the State Attorney's Office, along with two police detectives, began investigating the Hammocks' former Board President, Marglli Gallego, for alleged theft of association funds.

38.     The State Attorney's Office initially began issuing subpoenas to entities that do business with the Hammocks.

39.     For example, as early as August 2017, the State Attorney's Office sent subpoenas to banks and credit card companies that do business with the Hammocks.

40.     The State issued subpoenas to mortgage companies that did business with the Hammocks.

41.     The State issued subpoenas to companies that held Certificate of Deposits ("CD's) for the Hammocks.

42.     The State Attorney's Office issued subpoenas to credit cards companies that have accounts with the Hammocks.

43.     The State Attorney's Office issued subpoenas to FPL to determine if the former president was residing in her home.

44.     Even after the State Attorney's Office issued dozens of subpoenas to banks, mortgage lenders, credit card companies, vendors, and utility companies in 2017 and 2018, they issued over 20 more subpoenas to additional vendors and institutions in 2019.

45.     The State Attorney's Office even subpoenaed individuals to appear before them and provided them with immunity.

46.     Upon information and belief, the State Attorney's Office has even recently contacted banks where the Hammocks has accounts and asked the banks to question transactions related to the Hammocks, and to ***confirm that they belong to the association***.  The communication is a follows:

**From:** Eladia Fernandez <efernandez@popular.com>
**Sent:** Tuesday, September 28, 2021 9:42 AM
**To:** JESUS CUE <Jcue@W-BSC.COM>
**Cc:** Eladia Fernandez <efernandez@popular.com>
**Subject:** RE: Important to call me.

Please call me regarding the below......

Transactional activity of account ending #1164

- To whom those VISA Payments, ATT Payments, T-Mobile Payments and WEF WEFCntrpmt belongs? Provide supporting documentation as proof that these payments belong to the Association's expenses.
- We observe VISA Payments in near dates from 05/26/2021 to 06/01/2021. What is the reason to be performed like that?
- Same situations happen with ATT Payments on transactions posted on 06/01/2021. Could you validate why in this date they have 2 payments?

Also, if this is the activity, we should expect from the client going further.

Regards,

**From:** Yulia M. Fradkin <yfradkin@popular.com>
**Sent:** Wednesday, October 6, 2021 12:04 PM
**To:** Hilton Napoleon, II <hnapoleon@rascolock.com>
**Subject:** RE: Important to call me.- Hammocks Community

Hi Mr. Hilton –

My name is Yulia Fradkin, and I am in-house counsel at Popular Bank. Would you have a couple of minutes today to chat regarding the below?

Thank you.



Yulia M. Fradkin, Esq. | VP & Legal Counsel | Popular Bank
85 Broad Street, 11th Floor | New York, NY 10004
Tel: 212-445-1997 | Fax: 212-417-6602 | Email: yfradkin@popular.com

…

| | |
|---|---|
| **From:** | Hilton Napoleon, II |
| **Sent:** | Wednesday, October 6, 2021 5:34 PM |
| **To:** | 'Yulia M. Fradkin'; Eladia Fernandez |
| **Cc:** | 'JESUS CUE' |
| **Subject:** | FW: POPULAR BANK REQUEST FOR INFORMATION |
| **Attachments:** | ATT 05 25 21.pdf; ATT 06 01 21 2ND.pdf; ATT 06 01 21.pdf; T-MOBIL 05 17 21.pdf; T-MOBIL 06 15 21.pdf; VISA PMT 05 03 21.pdf; VISA PMT 05 26 21.pdf; VISA PMT 06 01 21.pdf; VISA PMT 06 10 21.pdf; WEFWEFCNTRPMT 05 03 21.pdf; WEFWEFCNTRPMT 06 15 21.pdf |

**Importance:**      High

Good Afternoon Yulia,

Nice speaking to you this evening.  Attached are the supporting documents regarding the questions below.  As I stated on the phone, the Hammocks is the largest homeowners association in the State of Florida.  It encompasses over 3,800 acres of land and there are 44 sub-associations – 18 of which are directly managed by the Hammocks.  There are approximately 15,000 people who live in the Hammocks. ███████████████████████

Considering the abovementioned facts, I am not sure why the Popular Bank is concerned about such miniscule amounts – although I have an idea of the source of the request.  Nevertheless, in order to resolve this issue, the Hammocks will answer the questions below.

1. The Hammocks has multiple business lines with ATT&T and several wifi service lines with T-Mobile in order to provide internet access to the security cameras that are spread throughout the association.
2. The Hammocks made Visa payments in close proximity to each other because there is a relatively low credit limit on the cards.  In order to clear space on the cards, the Hammocks had to pay down the balance.
3. As far as the AT&T payments are concerned, the Hammocks has multiple business lines, as you can see from the attachments.  The Hammocks makes an effort to pay its bills on time at the beginning of each month.

Thank you for your time and consideration to this matter.  Please feel free to contact me if you have any questions or concerns.

**Hilton Napoleon, II, Esq.**

47. Still to this day, the State Attorney's Office continues to issue subpoenas to banks, service providers and contractors with the Hammocks.

48. In fact, in a recent state court proceeding, the State Attorney's Office announced in open court the payment amounts that the Hammocks made to counsel regarding the multiple court cases that are pending.

49. The only way the State Attorney's Office could have obtained that information was from the bank records.

50. The State has obviously received thousands of documents from entities that do business with the Hammocks.

51. Yet, the State Attorney's Office still issued three outrageously burdensome

subpoenas to the Hammocks that would require it to produce hundreds of thousands of documents, if not more.

***Subpoena # 18-460.***

52.     On November 30, 2018, the State Attorney's Office served the Hammocks with Subpoena # 18-460.  See attached *Exhibit "A" - Subpoena # 18-460.*

53.     As the lead detective stated in her recent deposition, the State Attorney's Office and the investigators assigned to the case basically wanted to inspect all of the Hammocks' documents.

```
2        A     I requested a subpoena for all documents from
3   the Hammocks, all minutes, all vendors, all contracts,
```

54.     During a state court hearing, the State Attorney's Office even recognized the sweeping aspect and difficulty of their request:

> "We apologize, and it's very unfortunate that the scope of this investigation is very broad…  I'm not saying it's not difficult to go through these records.  … I mean, we make no bones about that…

55.     By their own admission, the State Attorney's Office's subpoenas are not sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.

56.     A prime example of the excessive reach of their subpoenas is their request for "all contracts for service, invoices, and billing statements for Normili Landscaping from January 2015 to the present day."  See Exhibit "A."

57.     Normili Landscaping was the company that provided the majority of landscaping, tree trimming, etc. throughout the Hammocks.

58.     Every time that Normili employees cut one of the 40,000 trees or provided

landscaping services anywhere inside of the 3,800 acres, Normilli would photograph its

employees' work before they started and after they completed work.

59.     Moreover, whenever a resident with the Hammocks needs a tree trimmed, they

are required to submit a request to the Hammocks.



60.     When the Hammocks receives a request, it must confirm the location of the home

to ensure it is actually part of the Hammocks.[3]

---

[3] There are non-Hammocks affiliated homeowners associations that are adjacent to sub-associations within the Hammocks.  Some owners of the non-affiliated homes believe that their homes actually fall within the Hammocks Community Association when they do not.



61.     The Hammocks then must verify that the homeowner requested tree trimming

services, as opposed to neighbors, who sometimes become upset and want the tree cut.



62.     The Hammocks then contacts the homeowner and confirms the location of the

tree because there are over 40,000 trees in the Hammocks.



63.     The Hammocks generates a purchase order.



64.     The tree is photographed before it is cut.



65.     The tree is photographed afterwards.[4]



66.     Although not pictured above, a check would also be sent to Normilli and an accounting record would be created.

67.     All of the abovementioned documents fall within the scope of the State's request for "all contracts for service, invoices, and billing statements for Normili Landscaping from

---

[4] This particular photograph is used as an example and does not relate to the invoice above.

January 2015 to the present day."

68.     Yet, the documents above are from *one* tree trimming request from *one* homeowner from *one* of the 44  sub-associations in the Hammocks, *i.e.* Haciendas.

69.     The documents related to that one tree trimming request represents a speck of the documents related to services provided by Normilli Landscaping.

70.     Haciendas at the Hammocks, where the homeowner lives, has a total of 110 residential units.



71.     However, the Hammocks has 6,537 total units.

72.     Accordingly, the <u>entire</u> Haciendas sub-association, as depicted by the yellow arrow below, represents 1.6% of the total units in the Hammocks.



73.     That one unit inside Haciendas that requested tree trimming services represents

0.00015298 of the total number of units in the Hammocks.

74.     Normilli landscaping provided tree trimming and landscaping services every

single day of the year at multiple locations per day.

75.     For the Hammocks to comply with the State's request for all documents related to

Normilli Landscaping from 2015 to the end of 2018, the Hammocks would need to produce over

100,000 documents.

76.     However, the State Attorney's Office wants all of the landscaping records from

the Hammocks from 2015 to 2022.  The landscaping records alone are estimated to be more than

200,000 documents.

77.     Again, the State's request is not sufficiently limited in scope, relevant in purpose,

and specific in directive so that compliance will not be unreasonably burdensome.

78.     The State's document request for other entities listed in Subpoena # 18-460 are similarly burdensome.

79.     For example, Excellent Services and Work provided all electrical services repair throughout the Hammocks and frequently performed general maintenance.

80.     Similar to Normilli, Excellent Services and Work provided services to the Hammocks every single day for multiple years and in multiple location in the Hammocks.

81.     The documents related to Excellent Services and Work could be in the hundreds of thousands of documents.

82.     The documents requested from the other entities listed in Subpoena # 18-460 are also estimated to be hundreds of thousands of documents.

83.     The State's request is not sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.

84.     The State Attorney's Office subpoena is even more complicated because they requested documents related to specific vendors.

85.     These vendors provided services in all 44 sub-associations, 6 pools, two clubhouses, etc.

86.     Unfortunately, the Hammocks does not maintain its records by particular vendors.

87.     Instead, the Hammocks maintains its records by the location that the services were render, *i.e.* the clubhouse(s), the particular sub-associations, and general land.

88.     This makes sense because, on most occasions, a unit owner is interested in the cost of services as it relates to their own sub-association, not the 43 other ones.

89.     If the Hammocks kept its records by vendors, it would be virtually impossible to give an accurate account of the cost required to maintain each sub-association, which is required

by law.

90.     Because of the manner in which the State issued its subpoena, the only way for

the Hammocks to fully comply *and* produce a certificate from the records custodian would be to

search through all of its records one by one, a process that extremely unreasonable an grossly

burdensome.

91.     In total, the Hammocks believes that it would be required to search through more

than a million documents, and it would probably take years and a large army of people to

comply.

92.     Furthermore, the State's request for a copy of all contracts and or documents

regarding loans, payment arrangements, payment methods, and past due assessments from 2015

to the present is not sufficiently limited in scope, relevant in purpose, and specific in directive so

that compliance will not be unreasonably burdensome.

93.     The Hammocks has 6,537 residential units.  Payments are made on a monthly

basis.

94.     Not surprisingly, many owners do not pay their assessments on time.

95.     The State Attorney's Office requested all documents regarding payment methods

or payment arrangements to address past due assessments.

96.     On average, at least 25% of the property owners pay their assessments late or do

not pay assessments at all.

Based on the State's request, the Hammocks would be required to produce over a half a

million documents alone.[5]

---

[5] Twenty five percent of the total units equates to 1,634 units.  There are 84 payments due over
the seven year period requested by the State.  Each late payment usually results in at least four
documents.

97.     This estimate does not even take into consideration payment arrangements for the 18 sub-associations managed by the Hammocks.

***Subpoena # 20-173.***

98.     In March of 2020, right as COVID-19 shut-down the entire world, the State served the Hammocks with Subpoena # 20-173, which requested approximately five years of documents relating to five more vendors that serviced the Hammocks.  See attached Exhibit "B"

99.     The documents requested from the entities listed in Subpoena # 20-173 are estimated to be hundreds of thousands of documents.

100.    To date, the State has not even tried to show how its subpoenas are limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.

101.    Again, the State's subpoena is even more complicated because they requested documents related to specific vendors.

102.    The Hammocks does not maintain its records by particular vendors.

***Subpoena # 21-487.***

103.    On June 3, 2021, the State issued Subpoena # 21-487 to the Hammocks.  See Exhibit "C."

104.    Many of the documents in Subpoena 21-487 are similar to the request in Subpoena 20-173.

105.    However, the State Attorney's Office added another vendor and two more people to its request.

106.    The Hammocks filed a motion to quash subpoena and motion for protective order, arguing, inter alia, that the State Attorney's Office's requests were overbroad and extremely

21

burdensome.

107.     Two state court judges initially ruled that the State Attorney's Office had to pay for the documents requested in the subpoenas.

108.     When a new judge took over the case, she ordered the Hammocks to provide many of the documents regardless of payment.

109.     The Hammocks moved for another protective order, which was denied. The Hammocks then sought a writ of certiorari to Florida's Third District Court of Appeals, asking the court to preclude the production of documents because of the enormous burden and cost.

110.     Florida's Third District Court of Appeals refused, finding that even an exorbitant cost of production does not equate to irreparable harm the would entitle the Hammocks to injunctive relief.

## COUNT I – CIVIL RIGHT VIOLATION

111.     The Hammocks re-alleges the allegations contained in paragraphs 1-110 of this Complaint.

112.     This action is brought by the Hammocks pursuant to Title 42, Section 1983, United States Code, for the deprivation of its Civil Rights by the State of Florida, Office of the State Attorney, Eleventh Judicial Circuit, Florida.

113.     Beginning on November 30, 2018 until the present day, the State Attorney's Office violated the Hammocks' Fourth Amendment right not to be subjected to unreasonable searches or seizures.

114.     The State Attorney's Office served three burdensome subpoena duces tecums upon the Hammocks that constituted a forbidden search under the Fourth Amendment.

115.     The terms of the *subpoena duces tecums* served upon the Hammocks were

unreasonable and far too sweeping.

116.    The State Attorney's Office has failed to show that its subpoenas were not unreasonable, excessive or overbroad.

117.    The State Attorney's Office failed to show that its subpoenas were sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome to the Hammocks.

**COUNT II – DECLARATORY RELIEF**

118.    The Hammocks re-alleges the allegations contained in paragraphs 1-110 of this Complaint.

119.    This action is brought by the Hammocks pursuant to Title 42, Section 1983, United States Code, for the deprivation of its Civil Rights by the State of Florida, Office of the State Attorney, Eleventh Judicial Circuit, Florida.

120.    The State of Florida purports to give the Office of the State Attorney *carte blanche* authority under Florida Statute 27.04[6] to issue subpoenas duces tecums regardless of the scope of the request for documents.

121.    Beginning on November 30, 2018 until the present day, acting pursuant to Florida Statute 27.04, the Office of the State Attorney issued three overbroad and unduly burdensome subpoena duces tecums that constituted a search forbidden by the Fourth Amendment.

---

[6] Florida Statute 27.04    Summoning and examining witnesses for state.—The state attorney shall have summoned all witnesses required on behalf of the state; and he or she is allowed the process of his or her court to summon witnesses from throughout the state to appear before the state attorney at such convenient places in the state attorney's judicial circuit and at such convenient times as may be designated in the summons, to testify before him or her as to any violation of the law upon which they may be interrogated, and he or she is empowered to administer oaths to all witnesses summoned to testify by the process of his or her court or who may voluntarily appear before the state attorney to testify as to any violation or violations of the law.

122.    No judicial officer has reviewed all three subpoenas to determine whether the collective effect of the State Attorney's Office request was unreasonable, excessive or overbroad.

123.    As applied, Florida Statute 27.04 is unconstitutional to the extent that it purports to grant the State Attorney's Office unfettered authority to issue subpoena duces tecums without regard to the protections granted by the Fourth Amendment.

124.    The terms in *subpoena duces tecums* were "unreasonable" and "far too sweeping in their terms."

125.    The State of Florida failed to show that its subpoena was sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."

126.    Accordingly, the Hammocks respectfully requests that this Honorable Court declare that the State of Florida's interpretation and application of section 27.04 of the Florida Statutes is unconstitutional as applied and deprives the Hammocks of its Fourth Amendment right against illegal searches and seizures as declared by the Supreme Court of the United States.


**COUNT III – INJUNCTIVE RELIEF**

127.    The Hammocks re-alleges the allegations contained in paragraphs 1-110 of this Complaint.

128.    This action is brought by the Hammocks pursuant to Title 42, Section 1983, United States Code, for the deprivation of its Civil Rights by the State of Florida, Office of the State Attorney, Eleventh Judicial Circuit, Florida.

129.    Beginning on November 30, 2018 to the present day, the State of Florida violated the Hammocks' Fourth Amendment right not to be subjected to an unreasonable or searches or seizures.

130.    The State Attorney's Office issued three burdensome *subpoena duces tecums* that constituted a search forbidden by the Fourth Amendment.

131.    The terms in *subpoena duces tecums* were "unreasonable" and "far too sweeping."

132.    The State Attorney's Office has failed to prove that its subpoena was not unreasonable, excessive or overbroad.

133.    The State Attorney's Office failed to show that its subpoena was sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."

134.    The Hammocks has demonstrated: (a) a substantial likelihood of success on the merits; (b) that irreparable injury will be suffered if the relief is not granted; (c) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (d) that the entry of relief would serve the public interest.

135.    Accordingly, the Hammocks respectfully request that this Honorable Court enter an Order quashing all subpoenas issued by the State Attorney's Office until a determination is made that their document request comports with the Fourth Amendment as directed by the Supreme Court of the United States.

WHEREFORE, Plaintiff, Hammocks Community Associations, demands judgment for its economic damages, declaratory and injunctive relief, attorney's fees, the costs of prosecuting this action, and any other relief this Court deems proper and just.

## DEMAND FOR JURY TRIAL

The Hammocks demands a jury trial of all issues so triable as of right by a jury.

DATED: July 6, 2022.

Hilton Napoleon, II, Esq., FBN 17593
RASCO KLOCK  PEREZ NIETO
2555 Ponce de Leon Blvd., Suite 600
Coral Gables, Florida 33134
Telephone: 305.476.7111
Facsimile: 305.675.7707

*Counsel for the Plaintiff, Hammocks Community Association, Inc.*

By: */s/ Hilton Napoleon, II*
        Hilton Napoleon, II